[No. 31744.   Department One.   August 23, 1951.]

THE STATE OF WASHINGTON, *Plaintiff and Relator*, v. JULIAN TUGAS, *Defendant*.[1]

*Ronald R. Hull* and *Paul M. Goode,* for relator.

*Tonkoff & Holst,* for defendant.

HILL, J.—The prosecuting attorney for Yakima county seeks a writ of prohibition to prevent the superior court for that county from proceeding with a jury trial for the purpose of determining whether Julian Tugas has become sane since his commitment to the criminally insane ward at the penitentiary and is not liable to a recurrence of mental unsoundness or relapse, and is a safe person to be at large.

Tugas was found not guilty of murder by reason of insanity. The jury also found that he was not insane at the time of the trial, but that there was "such likelihood of a relapse or recurrence of the insane or mental irresponsible

[1]Reported in 234 P. (2d) 1082.

condition" that he was not a safe person to be at large. He was committed to the penitentiary as a criminally insane person. (For the prior history of the case in this court, see *State v. Tugas*, 37 Wn. (2d) 236, 222 P. (2d) 817.)

At the outset of our inquiry, we find ourselves confronted with a statute which quite patently needs some clarification. It is chapter 30 of the Laws of 1907, "AN ACT relating to the criminal insane, their trial, commitment and custody." The first four sections are found as Rem. Rev. Stat., §§ 2173-2176 [P.P.C. §§ 133-1 to 133-7], inclusive; the other six sections are Rem. Rev. Stat., §§ 6969-6974 [P.P.C. §§ 133-9 to 133-19], inclusive.

If a defendant commits a crime and is found not guilty by reason of insanity or mental irresponsibility, he falls, by reason of the special verdict required by §§ 3 and 4 of the act (Rem. Rev. Stat., §§ 2175-2176), into one of three categories: (a) Where the insanity continues to exist at the time of trial; (b) where the insanity does not continue to exist at the time of trial but there is such likelihood of a recurrence or relapse as to render the defendant unsafe to be at large; or (c) where the insanity does not continue to exist at the time of trial and there is no likelihood of a recurrence or relapse which would render the defendant unsafe to be at large. If a defendant falls into category (c), he must be released; if he falls into category (a) or (b), he is to be "committed as a criminally insane person until such time as he shall be discharged as hereinafter provided." Laws of 1907, chapter 30, § 4; Rem. Rev. Stat., § 2176.

Our first concern is whether the defendant in category (b) can secure a discharge from the criminally insane ward at the penitentiary "as hereinafter provided," that is, under the provisions of § 6 of that chapter, being Rem. Rev. Stat., § 6970. An analysis of that section shows that, while clearly applicable to persons in category (a), its applicability to persons in category (b) is open to question. We have divided the procedure for discharge as set forth in that section into seven steps, and have indicated by italics the language that would seem to make it inapplicable to those in category

(b) and render a discharge for those in that category impossible in so far as any procedure under that section is concerned.

Step 1. The person committed and *claiming to have become sane or mentally responsible,* and to be free from danger of any relapse or recurrence of mental unsoundness and a safe person to be at large, applies to the physician in charge of the criminally insane for an examination of his mental condition and fitness to be at large. (Tugas applied to the physician for an examination.)

Step 2. That physician must certify to the warden of the penitentiary that there is reasonable cause to believe that the person seeking release *has become sane since his commitment* and is a safe person to be at large. (The physician in charge of the criminally insane did make such a certificate to the warden of the penitentiary with relation to Tugas. That physician later made an affidavit stating that he had not intended to do more than certify that Tugas was sane at the time he was examined, and that it was not intended to certify that there had been a change in his mental condition since his commitment. The physician also sent the following letter to the warden:

"I have seen Julian Tugas twice in the last few months, and each time that I saw him, he impressed me as being perfectly sane. However, I do not feel that I can certify that there is any change in his mental condition since his commitment to the institution.

"Therefore, since I feel that I was mistaken as to the intent of a previous letter which I apparently signed, I wish you would consider the withdrawal of this previous letter.")

Step 3. The warden shall then permit the person so committed to petition the court that committed him praying for a discharge from custody. (The warden did, on the basis of the physician's first certificate, give Tugas written permission to petition the superior court for Yakima county for his discharge from custody, which permission has not been withdrawn.)

Step 4. The petition must (a) set up the facts leading to the commitment of the person applying for a discharge

from custody, (b) assert that *he has since become sane and mentally responsible* and (c) is in such condition that he is a safe person to be at large, and the petition shall pray for his discharge from custody. The petition is presented to the court that committed him, and shall be served on the prosecuting attorney for the county, and it shall be the duty of the prosecuting attorney to resist the application. (Tugas did present such a petition to the superior court for Yakima county, and the first certificate by the physician and the permission of the warden were attached thereto as exhibits.)

Step 5. The superior court so petitioned shall set the cause down for trial before a jury, and the trial shall proceed as in other cases. The sole issue at the trial shall be "whether the person petitioning for a discharge *has, since his commitment, become a safe person to be at large,* and the burden of proof shall be upon him." (It is to prohibit the superior court from taking this step, *i.e.,* from proceeding with the jury trial, that the writ of prohibition is requested.)

Step 6. The jury shall be required to find whether the prisoner (a) *has become sane since his commitment,* (b) is not liable to a recurrence of the mental unsoundness or a relapse, and (c) is a safe person to be at large. If it so finds, he is entitled to a discharge; if not, his petition shall be dismissed and he shall be remitted to custody.

Step 7. Either party may appeal to the supreme court from the judgment discharging the petitioner or remitting him to custody.

In *State v. Saffron,* 146 Wash. 202, 262 Pac. 970, the defendant, like Tugas, had been placed in category (b) by the verdict of the jury, and we affirmed his commitment to the criminally insane ward of the penitentiary. It was urged in that case that § 6 of chapter 30, Laws of 1907 (Rem. Rev. Stat., § 6970), was unconstitutional because a petitioner could be deprived of a hearing on his sanity by the arbitrary refusal of the physician to make the certificate required in step 2. We met that contention by saying that the presumption was that the physician would perform the duties of his office fairly and properly, and that if he failed to do so the

situation was not without a remedy. We then made the statement:

"There is nothing in the law that prevents appellant making his application, at any time, to be restored to liberty on the ground of a restoration to sanity and from danger of relapse and aptitude to recur to violence, and for a hearing thereon in some judicial tribunal."

Notwithstanding that statement, we are of the opinion that the section in question, by reason of the language we have italicized, cannot have application to an individual who, like Tugas, was sane at the time of trial and at the time of commitment, but was committed because the jury found that there was such likelihood of a recurrence or relapse as to render him unsafe to be at large.

We adhere to our holding in the *Saffron* case, *supra,* that a person in category (b) can be committed as criminally insane, and we agree that he is entitled to a hearing "in some judicial tribunal" as to whether or not he has, subsequent to his commitment, become a safe person to be at large. As we said in *State ex rel. Colvin v. Superior Court,* 159 Wash. 335, 343, 293 Pac. 986:

"A person committed as an insane person cannot be deprived of all judicial remedy looking to his discharge.

"So, if there be no statutory judicial remedy, habeas corpus is necessarily the proper judicial remedy."

Our conclusion is that Tugas, by the very circumstance of being adjudicated to be sane at the time of his commitment, cannot bring himself within the terms of Rem. Rev. Stat., § 6970, which clearly requires the individual seeking release thereunder to establish that he has become sane since his commitment.

We hold that Rem. Rev. Stat., § 6970, which gives the superior court for Yakima county the right to proceed with a hearing on the petition for the discharge of a person in category (a) and committed as criminally insane from that county, has no application to persons in category (b). We therefore conclude that the superior court for Yakima county is without authority to proceed with a hearing on

the petition of Julian Tugas for a discharge from custody in a proceeding under Rem. Rev. Stat., § 6970, and a writ will issue prohibiting any further proceedings by the superior court for Yakima county on that petition except to dismiss it.

SCHWELLENBACH, C. J., BEALS, DONWORTH, and FINLEY, JJ., concur.